OPINION OF THE JUSTICES TO THE SENATE AND THE
HOUSE OF REPRESENTATIVES.

*Redevelopment of Land.   Constitutional Law,* Public purpose, Taxation,
   Redevelopment of land, Delegation of powers, Equal protection of laws,
   Police power, Political subdivisions.   *Boston.   Taxation,* Real estate
   tax: exemption; Personal property tax: exemption.   *Contract,* Validity,
   Sovereign powers of Commonwealth, Police power, For exemption
   from taxation, For redevelopment of land.   *Municipal Corporations,*
   Relation to Commonwealth, Officers and agents.   *Zoning.*

Section 6 of the urban redevelopment corporation law, G. L. c. 121A, as
   amended through St. 1956, c. 640, § 1, delegating power to approve
   projects for the construction of buildings in blighted open areas, deca-
   dent areas and substandard areas in municipalities other than Boston
   to the State Housing Board after the municipal planning board, or the
   mayor or selectmen if there is no planning board, has made the findings
   required of the planning board and after the State Housing Board has
   made the findings required for its approval, and proposed amending
   legislation delegating power to approve such projects in Boston to the
   Boston Redevelopment Authority, with the concurrence of the mayor,
   after it has made the findings required by the proposed legislation for
   its approval, prescribe standards for approval both outside and in
   Boston with sufficient definiteness to support the delegations of powers.
   [774–776]
Under proposed legislation redefining "blighted open area," "decadent
   area," "sub-standard area," and "project" in G. L. c. 121A, § 1, and
   extending the definition of "project" from an undertaking consisting
   only of the construction of dwellings to an undertaking consisting of the
   construction of commercial, industrial, and other types of buildings as
   well as dwellings, a project undertaken in such an area would not lack
   a predominantly public purpose merely because the buildings to be con-
   structed therein were not dwellings.   [776]
Discussion of the elements to be considered in determining whether a
   project for the construction of buildings in a blighted open area, deca-
   dent area, or substandard area, as redefined by proposed legislation'
   granting tax concessions to the project, would be for a predominantly
   public purpose or a predominantly private purpose.   [777]
Proposed legislation empowering the Boston Redevelopment Authority to
   approve projects in Boston for the construction of buildings under the
   urban redevelopment corporation law, G. L. c. 121A, as amended, and
   prescribing definite standards for its approval, and providing that any
   person aggrieved by any vote of the Authority or any municipal officer
   or board might bring a petition for a writ of certiorari against the

Authority to correct errors of law and that c. 213, § 1D, as amended, and c. 249, § 4, as amended, should be applicable thereto, afforded adequate judicial review of the exercise of the power conferred.  [777–778]

Approval by the State Housing Board of projects outside Boston for the construction of buildings under the urban redevelopment corporation law, G. L. c. 121A, as amended, in accordance with definite standards prescribed, would be subject to review by certiorari under G. L. c. 249, § 4, as amended, and c. 213, § 1D, as amended.  [778]

A project approved by the appropriate public authority and operating under the urban redevelopment corporation law, G. L. c. 121A, as amended by certain proposed legislation, would be subject to adequate continuing public regulation respecting financing, construction, maintenance and management of the buildings, conformity of buildings constructed to specifications stated in the application for approval, and methods of accounting to support a determination that the project was for a public purpose.  [778–780]

Projects for the construction in or outside Boston of residential, commercial, industrial or other types of buildings in blighted open areas, decadent areas, and substandard areas as redefined in proposed legislation amending and supplementing G. L. c. 121A, approved by public authorities in accordance with prescribed standards and subject to continuing regulation by them, may constitutionally be accorded exemption from taxation provided such projects are duly found to be for a predominantly public purpose.  [770, 780]

Proposed legislation amending G. L. c. 121A respecting projects for the construction of buildings in blighted open areas, decadent areas, and substandard areas as redefined, which would leave projects outside Boston under the authority and regulations of the State Housing Board and place projects in Boston under the authority and regulations of the Boston Redevelopment Authority, would transfer to the Authority the powers elsewhere exercised by municipal planning boards and the State Housing Board, would empower the Authority to prescribe regulations applicable to Boston projects different from those prescribed by the State Housing Board for projects elsewhere and to permit Boston projects to deviate from zoning, building, health and fire laws without the proceedings necessary for deviations by projects elsewhere, and would prescribe applications for projects in Boston less comprehensive than applications for projects elsewhere, would not "constitute an unconstitutional discrimination in favor of" Boston projects "as against" projects elsewhere or deny equal protection of the laws in contravention of the Fourteenth Amendment to the Constitution of the United States to persons in municipalities other than Boston.  [781–783]

In proposed legislation amending the urban redevelopment corporation law, G. L. c. 121A, by providing that upon approval of a project by the State Housing Board the redevelopment corporation and the municipality in which the project has been authorized "shall contract for the carrying out of such project in accordance with the application [for approval], the provisions of . . . [c. 121A], and the rules, regulations and standards prescribed by the housing board for such project," the

further provision that "Such contract may provide that, without mutual consent, any subsequent amendment of any such provisions, rules, regulations and standards shall not affect the project" must be construed as contemplating only an agreement precluding for a reasonable time amendments respecting particulars of the contract reasonably inserted therein to facilitate proceeding with the project as a business investment, including particulars dealing with tax exemption, but not as contemplating an agreement precluding amendments under the police power respecting particulars closely related to the public health, morals, safety, or general welfare, or to governmental structure; so construed, such provision as to amendments would be constitutional and an agreement made thereunder would be binding upon the Commonwealth.   [783–786]

A contract with a municipality to undertake a project under the urban redevelopment corporation law, G. L. c. 121A, as amended by proposed legislation, may constitutionally provide in accordance with prescribed standards that the corporation, bank, or insurance company undertaking the project will pay to the municipality with respect to one or more years a specific amount in addition to the excise in lieu of taxes prescribed by § 10, as appearing in St. 1956, c. 640, § 4, thus in effect enabling the municipality to limit tax exemption to the minimum amount needed to induce the undertaking of the project.   [786–787]

Proposed legislation to abolish the planning board of Boston and transfer its powers and duties to the Boston Redevelopment Authority, and to transfer the powers and duties of the State Housing Board relating to redevelopment projects in Boston to the Authority subject to the approval of the mayor, is not precluded by any provision of art. 2 of the Amendments to the Constitution of Massachusetts, or of G. L. c. 121, §§ 26KK and 26ZZ, as amended, respectively, through St. 1957, c. 613, § 4 and § 5, or of G. L. c. 121A, § 7A, as amended through St. 1955, c. 654, § 4A.   [787–788]

Article 60 of the Amendments to the Constitution of Massachusetts would not invalidate proposed legislation authorizing the Boston Redevelopment Authority, with the approval of the mayor, to permit a redevelopment project in Boston under G. L. c. 121A, as amended, to deviate from a zoning law if the Authority found that such deviation would not substantially derogate from the intent or purpose thereof, even though different and greater standards and procedural safeguards are established for the granting of zoning deviations outside Boston.   [788–789]

On August 9, 1960, the Justices submitted the following answers to questions propounded to them by the Senate and the House of Representatives.

To the Honorable the Senate and the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to questions in an order adopted by

the Senate and by the House of Representatives on July 21, 1960, and transmitted to us on July 22, 1960. The order recites the pendency before the General Court of a bill, duplicate of a bill printed in Senate No. 634, a copy of which is transmitted with the order. The bill is entitled, "An Act concerning the development or redevelopment of blighted open areas, decadent areas and sub-standard areas by urban redevelopment corporations with special provisions for projects in the city of Boston." Senate No. 634 is a communication from the Attorney General which states that the bill is submitted to meet objections to a previous bill relating to the so called "Prudential center." See *Opinion of the Justices, ante,* 738.

The bill consists largely of amendments to G. L. c. 121A, entitled "Urban Redevelopment Corporations." Section 1 strikes out § 1 of c. 121A, as originally enacted by St. 1945, c. 654, § 1, and as amended by St. 1947, c. 15, St. 1953, c. 647, § 1, and St. 1954, c. 73, §§ 1 and 2, and substitutes a new set of definitions. The former limitation of "Blighted open area," to one "which is to be developed for predominantly residential purposes," has been eliminated. A fundamental requirement, retained in substance, now reads, "a predominantly open area which is detrimental to the safety, health, morals, welfare or sound growth of a community because it is unduly costly to develop it soundly through the ordinary operations of private enterprise." Also retained in substance are enumerated possible grounds of undue cost. Among them are physical conditions, such as ledge, rock, and unsuitable soil; the expense of excavation, fill, grading, retaining walls, waterproofing structures, drainage, or flood control; "tax and special assessment delinquencies"; and "substantial change in business or economic conditions or practices." To these have been added expense of foundations, protection of adjacent properties and the water table therein, "building around or over rights of way through the area," and "an abandonment or cessation of a previous use or of work on improvements begun but not feasible to complete without the aids

provided by this chapter, or by reason of any combination of the foregoing or other conditions.''

''Decadent area'' is defined as one ''which is detrimental to safety, health, morals, welfare or sound growth of a community'' because of the deteriorated condition of buildings; ''because much of the real estate in recent years has been sold or taken for non-payment of taxes or upon foreclosure of mortgages''; because buildings have been razed and their replacement is improbable; ''because of a substantial change in business or economic conditions, or because of inadequate light, air, or open space, or because of excessive land coverage, or because diversity of ownership, irregular lot sizes or obsolete street patterns make it improbable that the area will be redeveloped by the ordinary operations of private enterprise, or by reason of any combination of the foregoing conditions.'' The references to ''sound growth of a community''[1] and the next to the last clause relating to the improbability of redevelopment by private enterprise are new.

''Sub-standard area'' is defined as one ''wherein dwellings predominate which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light, or sanitation facilities, or any combination of these factors, are detrimental to safety, health, morals, welfare or sound growth of a community.'' The only new language is the words ''welfare'' and ''sound growth of a community.''[1]

''Project'' is ''any undertaking consisting of the construction in a blighted open, decadent or sub-standard area of decent, safe and sanitary residential, commercial, industrial, institutional, recreational or governmental buildings and such appurtenant or incidental facilities as shall be in the public interest, and the operation and maintenance of such buildings and facilities after construction.'' Formerly the definition was limited to ''dwellings.''

---

[1] The phrase ''sound growth of the community'' has always been in the definition of ''blighted open area.'' C. 121A, § 1, inserted by St. 1953, c. 647, § 1.

It will be noted that the definitions in the bill of "blighted open area," "decadent area," and "sub-standard area" differ from the definitions in G. L. c. 121, § 26J, in the housing authority law, as amended through St. 1957, c. 613, § 1.

Section 2 strikes out old § 2, as appearing in St. 1953, c. 647, § 1, and substitutes a new section. It declares, in substantial repetition of old § 2, that "the redevelopment of land not only in sub-standard areas but also in blighted open and decadent areas in accordance with a comprehensive plan to promote the sound growth of the community is necessary in order to achieve permanent and comprehensive elimination of existing slums and sub-standard, decadent and blighted conditions and to prevent the recurrence of such slums or sub-standard, decadent or blighted conditions or their development in other parts of the community or in other communities; and that the redevelopment of blighted open areas promotes the clearance of sub-standard and decadent areas and prevents their creation and occurrence; that the menace of blighted open, decadent or sub-standard areas is beyond remedy and control solely by regulatory process in the exercise of the police power and cannot be dealt with effectively by the ordinary operations of private enterprise without the aids herein provided." Both the old and new sections state that "the necessity in the public interest for the provisions hereinafter enacted is hereby declared as a matter of legislative determination." The revised section declares in great detail the respects in which blighted open, decadent, or substandard areas are injurious to the public interest and retard "the provision of residential, commercial and industrial buildings and other improvements." It also refers to the existence of "a shortage of decent, safe and sanitary buildings for residential, commercial, industrial, institutional, recreational, or governmental purposes." The declarations of the old section, in these respects, primarily deal with the effect of blighted open, decadent, or substandard areas in retarding the provision of dwellings and upon an existing shortage of dwellings. There is an obvious misprint in line 1 of

new § 2, which should read, "It is hereby declared that," and so forth.

Section 3 amends old § 3, as appearing in St. 1953, c. 647, § 1, by providing that in the case of a corporation formed for the carrying out of a project in the city of Boston, the project would be authorized and approved by the Boston Redevelopment Authority. A project in any other city or town would be authorized and approved by the State Housing Board, as is the case everywhere, including Boston, under old § 3. Section 4 of the bill amends old § 5 by confining applications to the State Housing Board to projects in municipalities other than Boston.

Section 5 inserts in G. L. c. 121A a new section, § 6A. This states that once a project has been approved by the housing board, the corporation and the municipality "shall contract for the carrying out of such project in accordance with the application, the provisions of this chapter, and the rules, regulations and standards prescribed by the housing board for such project. Such contract may provide that, without mutual consent, any subsequent amendment of any such provisions, rules, regulations and standards shall not affect the project." The intended scope of this last sentence is not clear. Our interpretation of its meaning will be given in our discussion of questions 7 and 9. "Nothing in section ten [of c. 121A which provides for exemption of projects from local taxation under G. L. c. 59] shall prevent such contract from further providing for such corporation to pay to the city or town with respect to one or more years such specific or ascertainable amount in addition to the excise prescribed by section ten as may have been stated in the application."

By § 14 of the bill the term "housing board" in § 6A, as to projects in the city of Boston, means the Boston Redevelopment Authority.

Section 6 of the bill strikes out old § 8, inserted by St. 1945, c. 654, § 1, and inserts a new section. Construction of buildings shall be inspected by persons appointed by the housing board. "Every such corporation shall be deemed

to have been organized to serve a public purpose,[1] and shall remain at all times subject to all reasonable rules and regulations applicable to its project. All real estate acquired by any such corporation and all structures erected by it shall be deemed to be acquired or erected for the purpose of promoting the public health, safety and welfare and shall be subject to the provisions of this chapter." If the housing board shall find that a corporation has violated any provision of c. 121A or the requirements as to the construction and financing of a project, or payments therefor, or the applicable rules and regulations, or that a project is not maintained in such a way as to carry out the purpose for which it was designed, or that there has been waste caused by unreasonable use, it may institute a proceeding in equity in its own name.

Other sections of the bill seek to amend c. 121A, § 18, which deals with projects which insurance companies may undertake with the approval of the commissioner of insurance. Section 7 would allow an insurance company to undertake a project "on land owned or to be acquired by it." Section 8 would amend § 18 (e), as appearing in St. 1953, c. 647, § 8, so that the term "housing board" in c. 121A, § 8, would mean the commissioner of insurance as to insurance company projects no matter where the project is situated. Section 9 would amend § 18 (f), inserted by St. 1945, c. 654, § 1, by adding, at the end of the following: "such company shall not receive or accept for its general purposes as net income from a project any sum in excess of six per cent of the amount invested by it in such project for each year in which it owns or has owned the project," the exception that, "if in any year it has so received a sum less than the aforesaid six per cent, it may so receive in a subsequent year or years additional sums not exceeding in the aggregate such deficiency without interest." Section 11

---

[1] General Laws c. 121A, § 18, as amended by St. 1953, c. 647, § 8, excepts, as to insurance companies, certain requirements of c. 121A. One of these is found in § 18 (e), where this part of the quoted sentence "shall be construed to mean 'Every such project shall be deemed to have been undertaken to serve a public purpose.' "

would add a new clause, § 18 (g ½), and § 12 would add a new sentence to § 18 (h), inserted by St. 1945, c. 654, § 1. These respectively provide that the term "housing board" in two sections of c. 121A shall mean the commissioner of insurance whether the project is in Boston or another city or town. Section 13 adds a new clause, § 18 (i ½), which would compute the period of forty years for carrying on a project as provided in c. 121A, §.10 (as amended through St. 1956, c. 640, § 4); § 16 (as amended by St. 1953, c. 647, § 5); and § 16A (inserted by St. 1953, c. 647, § 5), from the date of the approval of the project.

Section 14 is not an amendment of the General Laws. It makes the Boston Redevelopment Authority the authority in the city of Boston to approve projects, abolishes the planning board of the city, and confers all its powers and duties on the Boston Redevelopment Authority. The appropriations and personnel of the planning board are transferred to the Boston Redevelopment Authority.

Section 15, which is not an amendment of the General Laws, consumes one hundred and fifty-nine lines unbroken by any numbered or lettered subdivisions. It makes provision for application to the Boston Redevelopment Authority as to projects in the city of Boston. The application shall specify the location of the project, shall state the reasons why it is necessary or desirable and the uses to which it is to be put, shall contain in general terms a description of the buildings, structures, and facilities which it is proposed to furnish, and shall be accompanied by a site plan and drawings of the buildings and other improvements adequate to show the nature and extent of the project. This is similar to the requirements of G. L. c. 121A, § 5, inserted by St. 1945, c. 654, § 1, with the differences that § 5 requires the application (1) to contain the estimated cost of the project and the amount of capital it is proposed to furnish, and (2) to be accompanied by a site plan and typical building plan and typical elevations of the proposed buildings or structures. There is a provision for a public hearing following which the Authority shall make such determinations

as may be required by c. 121A, and shall determine whether conditions exist which warrant the carrying out of the project, whether in its opinion the project will be practicable, whether the project conflicts with the master plan for the city or would be in any way detrimental to the best interests of the public or city or to the public safety or convenience or inconsistent with the most suitable development of the city, and whether the project will constitute a public use or benefit. If its determination is adverse, the Authority shall disapprove the project. If the destruction of dwellings is involved, it must find that there is a feasible method for relocating displaced families. If the project includes land approved by the State department of public works for the extension of the Massachusetts Turnpike into Boston, the Authority shall not approve unless the Massachusetts Turnpike Authority determines that the project will not unreasonably interfere with the extension. The Boston Redevelopment Authority shall make a written report stating reasons for approval or disapproval. It may suggest changes. Whenever a project is approved, it shall embody in its report reasonable rules and regulations setting minimum standards for the financing, construction, maintenance, and management of the project in so far as these are not specified in the application. It may not issue a certificate of approval without the mayor's approval. The Boston Redevelopment Authority, with the approval of the mayor, shall have exclusive power to deviate from any zoning, building, health or fire law, code, ordinance, or regulation if it finds that the variance does not substantially derogate therefrom. Any person aggrieved by a vote of the Authority under § 14 or § 15, "or any municipal officer or board," may, within thirty days after proper filing of the approval with the city clerk, bring a petition for writ of certiorari against the Authority to correct errors of law. The time for bringing a petition for a writ of certiorari under G. L. c. 249, § 4, as amended by St. 1943, c. 374, § 1, as applicable to other corporations, is "two years next after the proceedings complained of." It is only by implication

that the bill requires filing of votes of the Authority with the city clerk. Nor does the bill state whether the provision for review by certiorari is exclusive so as to preclude use of other court procedures, such as a declaration of rights under G. L. c. 231A. See *Madden* v. *State Tax Commn.* 333 Mass. 734, 736.

The questions are as follows:

"1. Is it within the competency of the General Court under Article IV of Section I of Chapter I of Part the Second of the Constitution of Massachusetts to exempt from taxation, subject to the provisions of Sections 10 and 15 of Chapter 121A of the General Laws, as amended, projects, as redefined in Section 1 of said bill, to be constructed in blighted open areas, decadent areas, and substandard areas as severally redefined in Section 1 of said bill?

"2. Will projects for commercial and industrial uses under said Chapter 121A, as amended by this act, be for public purposes?

"3. Would the answer to question 1 be the same for a project in Boston governed by the special provisions for public approval and regulation contained in Sections 14 and 15 of said bill?

"4. In view of Articles X and XXIII of Part the First of the Constitution of Massachusetts do the special provisions of Sections 14 and 15 of said bill for the city of Boston, transferring to the Boston Redevelopment Authority regulatory functions relative to urban redevelopment projects now vested in divers boards and officers, constitute a sufficient and adequate regulation by public authority for the purposes of Sections 10 and 15 of Chapter 121A of the General Laws?

"5. Do the special provisions of Sections 14 and 15 of said bill for the city of Boston transferring to the Boston Redevelopment Authority regulatory functions relative to urban redevelopment corporations now vested in divers boards and officers, constitute an unconstitutional discrimination in favor of projects in the city of Boston as

against projects in other cities and towns in the Commonwealth, or do such provisions deny equal protection of the laws to persons within such other cities and towns in contravention of the 14th Amendment of the Constitution of the United States?

"6. Is it constitutionally competent for the General Court under the equal protection clause of the 14th  Amendment of the Constitution of the United States and Articles X and XXIII of Part the First, and Article IV of Section I of Chapter I of Part the Second of the Constitution of Massachusetts, to provide, pursuant to said bill, that the approval and regulation of projects to be undertaken in Boston by corporations other than insurance companies, savings banks and groups of savings banks shall be vested exclusively in the Boston Redevelopment Authority, subject to the approval of the Mayor of Boston?

"7. Is it within the competency of the General Court under Article IV of Section I of Chapter I of Part the Second of the Constitution of Massachusetts to authorize  cities and towns to contract, as provided in Section 5 of said bill, that, without mutual consent, a project under Chapter 121A of the General Laws shall not be affected by any subsequent amendment of said Chapter 121A or by any subsequent amendment of any rule, regulation or standard regulating such project?

"8. Is it within the competency of the General Court under Article IV of Section I of Chapter I of Part the  Second of the Constitution of Massachusetts to authorize a city or town to contract with an urban redevelopment corporation, bank or insurance company, as provided by Section 5 of said bill, for such corporation, bank or company to pay to a city or town with respect to one or more years such specific or ascertainable amount in addition to the excise prescribed by Section 10 of Chapter 121A as may have been stated in the application?

"9. In view of the several powers granted to the General Court by Article IV of Section I of Chapter I of Part

the Second of the Constitution of Massachusetts, will contracts entered into by cities and towns as provided in Section 5 of said bill, be binding upon the Commonwealth so that as to any particular project, any subsequent amendment of Chapter 121A, including Section 10 thereof, without provision for adequate compensation, shall not be applicable to such project?

"10. Is it constitutionally competent for the General Court in view of Article II of the Articles of Amendment of the Constitution of Massachusetts and of provisions of Sections 26KK and 26ZZ of Chapter 121 of the General Laws and the provisions of Section 7A of Chapter 121A to abolish the planning board in the City of Boston and transfer its powers and duties to the Boston Redevelopment Authority subject to the approval of the Mayor of said City and to transfer the powers and duties of the State Housing Board in Boston under said Chapter 121A to the Boston Redevelopment Authority subject to the approval of the Mayor of said City as provided in Section 14 of the proposed bill?

"11. Is it constitutionally competent for the General Court under Article LX of the Articles of Amendment of the Constitution of Massachusetts to permit the Boston Redevelopment Authority subject to the approval of the Mayor to grant permission for deviation from a zoning law as provided in Section 15 of the proposed legislation?"

The first question seeks an opinion under the Constitution, Part II, c. 1, § 1, art. 4, wherein the General Court is given a power "to impose and levy . . . reasonable assessments, rates, and taxes, upon all the inhabitants of, and persons resident, and estates lying, within the said commonwealth . . . ." More definitely, the opinion sought is the legislative power to exempt from taxation projects, as redefined in § 1 of the bill, to be constructed in blighted open areas, decadent areas, and substandard areas, all as redefined in § 1 of the bill. The question directs our attention to G. L. c. 121A, §§ 10 and 15, as amended, two sections

which are not sought to be amended further by the bill.

Section 10 (as amended through St. 1956, c. 640, § 4) provides that, for forty years after its organization, each corporation formed under c. 121A, § 3 (as amended by St. 1953, c. 647, § 1, and as proposed to be amended further by § 3 of the bill), "and all its real and personal property . . . shall be exempt from taxation and . . . shall not be required to pay any tax, excise or assessment to . . . the commonwealth or . . . its . . . subdivisions," except excises provided in § 10 itself and in § 15 (as amended through St. 1953, c. 647, § 4), motor vehicle and gasoline excises. If the corporation enters into a contract for improvements with the municipality under § 14, inserted by St. 1945, c. 654, § 1, it may agree therein to make payments in lieu of betterments and special assessments. Instead, § 10 requires that during the forty year period each corporation annually "shall pay . . . an excise equal to the sum of . . . [a] five per cent of its gross income in . . . [the] preceding calendar year, . . . and [b] . . . ten dollars per thousand upon . . . the fair cash value as of January first in the year in which the excise becomes payable of all real and tangible personal property of such corporation." The proceeds of the excise are to be distributed to the city or town in which the project is located. The excise is not to be less than a minimum computed by a somewhat complicated formula, which we need not set out in detail. In the case of a project carried out by an insurance company, the provisions of c. 121A "shall, so far as apt, be applicable to such company" subject to various exceptions, which include in § 18 (g) a statement that § 10 "shall apply to an insurance company only with respect to a particular project or . . . projects, and such company shall remain subject to all other taxation . . . with respect to its other activities." Section 18 (g), as proposed to be amended by § 10 of the bill, will provide for computing the rental value of space in such a project occupied by a company itself to be used in computing the gross income of the project.

Closely related to c. 121A, § 10, is § 15, which provides for what is essentially contingent additional taxation of a

project in the event that its gross receipts in any year shall exceed the aggregate of certain specified expenses, permitted transfers to reserves, and amortization. The city or town in which the project is situated is to receive these excess receipts unless they exceed the difference between (a) the taxes which would have been paid in that year, were it not for the tax exemption under § 10, and (b) the excise under § 10 actually paid in that year. Any balance of excess receipts may, with the approval of the housing board (in Boston, the Authority), be applied to the reduction of the project's debt or to its improvement.

It is thus apparent that § 10 provides for each project an excise in lieu of local property taxes from which the project is to be exempt. The total tax and excise burden of a project will probably be less than it would be if not so exempt, although this difference may be reduced or eliminated, under § 15, to the extent that in any year the project has excess income, or by a contractual arrangement under new § 6A to pay more than the minimum excise as a contribution to the community.

Senate No. 634 differs materially from the bill relating to the Prudential center recently considered in *Opinion of the Justices, ante,* 738. That bill outlined one particular project, but without sufficient clarity to enable us to determine whether it was for a predominantly public purpose. We pointed out at page 759, "The project must be demonstrably of a character reasonably justifying separate classification and treatment for tax exemption." Senate No. 634, by amending general legislation, purports to delegate to administrative bodies power to approve projects—in Boston to the Boston Redevelopment Authority and in other municipalities to the State Housing Board. "If there is to be a delegation of authority to approve, [1] the details or standards for approval must be specified, and [2] any action must be made subject to review of the adequacy of compliance with standards." *Opinion of the Justices, ante,* 738, 759.

What are the details or standards for approval which would obtain should S. 634 be enacted?

A. For municipalities other than Boston these would continue as at present under c. 121A, § 6. The planning board (or the mayor or selectmen if there is no planning board) in its report must determine (1) whether the plan is a project as defined in § 1; (2) whether it is within a decadent, substandard, or blighted open area as redefined in § 1; and the following particulars as required in § 6; (3) whether the project conflicts with any master plan for the municipality; (4) whether it is in any way detrimental to the best interests of the public or the municipality or the public safety and convenience, or inconsistent with the most suitable development of the municipality; and (5) whether it will constitute a public use and benefit. (6) If dwellings are involved, other findings must be made. The State Housing Board, if it receives a certificate of approval from the mayor or the selectmen, and the planning board (if any), must make these findings: (1) that "the conditions exist which warrant the carrying out of the project"; (2) that in its opinion the cost of the project has been correctly estimated; (3) that it will be practicable; and (4) that the construction and use of the project will not be in contravention of any zoning, subdivision, health, or building ordinances or by-laws or municipal regulations, or the standards fixed by the housing board under § 4.

B. In Boston, the approval of projects would be by the Boston Redevelopment Authority, to be concurred in by the mayor and not by the housing board. As we read §§ 14 and 15 of the bill, the Authority would make most of the findings required for projects outside Boston. It would make findings in the six numbered categories (*supra*) required of planning boards and in categories 1 and 3 (*supra*) required of the housing board. It also necessarily would find whether the project complied with the requirements of § 15 of the bill. There is no provision, as under § 6 of c. 121A, that it state its opinion whether the cost of the project has been correctly estimated, although, as a practical matter, this seems to be comprehended by other required findings. In § 15 of the bill no finding is required that

there will be no contravention of zoning, subdivision, health, or building ordinances. On the contrary, "the authority with the approval of the mayor . . . shall have exclusive power, both before and after the approval of a project, to grant from time to time permission . . . to deviate" from any zoning, building, health or fire law, code, ordinance, or regulation in described circumstances. If the project includes land approved for the extension of the Massachusetts turnpike, the Massachusetts Turnpike Authority must determine that the project will not unreasonably interfere with the extension.

We conclude that the details or standards for approval both without and within the city of Boston, although capable of more definite expression, are nevertheless sufficiently definite for the exercise of delegated legislative authority.

Our decisions thus far have upheld slum clearance under the housing act (G. L. c. 121, as amended) as a public purpose (*Allydonn Realty Corp.* v. *Holyoke Housing Authy.* 304 Mass. 288) even though restrictions be imposed which might preclude residential use of the cleared area when sold or leased for development. *Papadinis* v. *Somerville,* 331 Mass. 627, 633. The *Papadinis* case concerned an area which was "decadent" and "substandard." In *Opinion of the Justices,* 334 Mass. 760, 763, the opinion was expressed that the redevelopment of a "blighted open area" was likewise a public purpose.

Senate No. 634 extends the scope of the definitions of projects to include the erection of commercial, industrial, and other types of buildings. If an area is found to fall within any of the three types of areas redefined in § 1 of the bill, the project would not fail as a public purpose merely because the cleared area is to be rebuilt with buildings which are not dwellings. Taking as an example the area which was the subject of the *Opinion of the Justices, ante,* 738, if the Back Bay land there described should be found to constitute any type of area redefined in § 1 of the bill, its rehabilitation would not, on balance, necessarily become

a private purpose because the project, which may be given favorable tax concessions, embraces the construction of buildings which are wholly or largely not residential. There is no constitutional requirement that a blight, for example, if removed in the course of urban redevelopment, particularly if it is found to be one not about to be eliminated by private capital, must be replaced by residential buildings.

The elements, some public in character and others private, which are material to determining whether a given project is preponderatingly one or the other, are to be judged on their relative weight by a public body or official charged with the duty of making that determination and by the courts having the duty to review. On the one hand, consideration must be given to any loss of tax revenue from new construction, the use and possible gain accruing to private interests from a completed project, and any other factors (see *Allydonn Realty Corp.* v. *Holyoke Housing Authy.* 304 Mass. 288, 292–293), tending to show a private character. Against these considerations are to be weighed the public advantages to be gained and the necessity of resort to the provisions of c. 121A as affected by the bill (rather than waiting for private enterprise to act) in order to achieve those advantages. If the Prudential center again is used as an example, there are many public advantages to be considered. These would include the elimination of grave doubts as to the future use of a great area, now largely vacant or occupied by a nearly obsolete, unsightly railroad freight yard; covering over a railroad right of way; improvement to neighboring properties; the encouragement of prompt action unlikely to be undertaken by private enterprise in the foreseeable future; stimulation of other building and opening a new opportunity for urban growth at what might be a time which is appropriate but of short duration; and new facilities made available to public use.

We think that a sufficient procedure has been provided for review of the delegated action as to its adequate compliance with the prescribed standards. In the city of Bos-

ton § 15 of the bill allows a petition for writ of certiorari to be brought against the Boston Redevelopment Authority by an aggrieved person, and (as we read § 15) also by "any municipal officer or board," in order to correct errors of law in any vote of the Authority under § 14 or § 15. Expressly made applicable are the provisions of G. L. c. 213, § 1D, and G. L. c. 249, § 4, both as amended.[1] The latter statute permits the contention that "the evidence which formed the basis of the action . . . or . . . of any specified finding or conclusion was as matter of law insufficient to warrant such action, finding or conclusion." See *DiMaggio* v. *Mystic Bldg. Wrecking Co. Inc.* 340 Mass. 686, 691. There is no provision in c. 121A or S. No. 634 for a review procedure outside Boston. Nevertheless, c. 213, § 1D, and c. 249, § 4, would, on general principles, be applicable. *Board of Health of Woburn* v. *Sousa,* 338 Mass. 547, 553. As to whether other procedures also might apply both in Boston and in other municipalities, we have no present occasion to express an opinion.

We next give attention to the issue whether the projects operating under c. 121A, as amended by the bill, are subject to adequate public regulation.

In *Opinion of the Justices,* 334 Mass. 760, 763, it was stated that since "urban redevelopment corporations, although in a sense private corporations, perform functions for the public benefit analogous to those performed by various other types of corporations commonly called public service corporations, property owned by them and used in such service may receive favored treatment in the matter of taxation," in that instance (see p. 764) "so long, not exceeding forty years, as the project continues to be operated under public regulation and for the public benefit." The Justices, in advising that the tax exemption contained in what is now c. 121A, § 10, would be valid if enacted, laid some emphasis upon the provisions of c. 121A, § 8, "Every such corporation shall be deemed to have been organized

---

[1] These sections are made applicable "except as herein provided." We are unable to identify any contrary provision to which reference is intended.

to serve a public purpose, and shall remain at all times subject to reasonable rules and regulations of the housing board.'' That opinion thus treats as important, as a factor sustaining the proposed tax exemption, the continuing regulation of urban renewal projects by a public body, in much the manner in which public utilities remain subject to regulation. With respect to projects outside Boston, regulation, as provided in c. 121A, by the housing board and the insurance commissioner, in their respective areas, will remain substantially unchanged by the present bill. Boston projects, although regulated by the Authority (and the insurance commissioner in those matters relating to insurance company projects committed to him) rather than by the housing board, also will be under substantially the same regulation as is applied to all projects by c. 121A.

We enumerate the principal features of such continuing regulation. (1) For each Boston project, the Authority (§ 15 of the bill) must prescribe in its approval of the project rules and regulations, applicable to that project, setting minimum standards for its financing, construction, maintenance, and management. Projects outside Boston are subject to the housing board's rules and regulations promulgated under c. 121A, § 4. (2) Under c. 121A, § 8, as to be modified by § 6 of the bill, the construction of buildings of a project is to be inspected by the appropriate public authority to ensure conformity with the application. In the event that violations are found to exist of the provisions of c. 121A, of the requirements with respect to construction and financing, of the applicable rules and regulations, or of applicable requirements as to maintenance and use, the bondholders of the project and the trustee for them are to be notified. The appropriate public authority, in addition to other remedies, may bring a bill in equity to prevent such violations. (3) The income return from a project is limited to six per cent dividends by c. 121A, § 9, as affected in the case of insurance companies by § 9 of the bill. The provisions of c. 121A, § 9, are closely related to the provision, already mentioned, for

additional payments, in lieu of taxes, to be paid (as provided in c. 121A, § 15) if there is gross income from a project in any year in excess of the project's expenses, limited dividends, amortization, and other allowable deductions. Neither c. 121A nor the bill makes specific provisions with respect to accounting methods. Accounting requirements are usual in public service company regulations. We think that such requirements are authorized (if, indeed, not required by implication) as a part of the regulations to be issued under c. 121A, § 4, and under § 15 of the bill. Without such regulations, enforcement of the additional payments in lieu of taxes (c. 121A, § 15) and of the limited six per cent return (c. 121A, § 9) would hardly be possible. It may be expected also that regulations will deal with the allocation to each project of expenses incurred with respect to that project where an insurance company is concerned. See c. 121A, § 18 (a), and (f), as amended by § 9 of the bill.

These provisions for continuing regulation, taken together with the regulations for the original approval of projects, would lend further support to a legislative declaration that such projects are for a public purpose. See *Opinion of the Justices,* 334 Mass. 760, 763–764; *Cabot* v. *Assessors of Boston,* 335 Mass. 53, 65–68.

The first question is too general to answer without qualification. In *Opinion of the Justices, ante,* 738, 748–749, we said that ''the development of constitutional principles in this Commonwealth has made the determination whether a given project is predominantly for a public purpose dependent upon the circumstances of each individual case.'' To the first question, if qualified as containing a proviso that each project is properly found (in accordance with c. 121A as amended by the bill) to be for a public purpose, we answer, ''Yes.''

Question 2 is much too broad for a categorical answer. Projects for commercial and industrial uses may be for a public purpose, but each must be found (in accordance with c. 121A as amended by the bill) properly to be for such a purpose. We beg to be excused from further answering question 2.

Question 3 seeks to learn whether the answer to question 1 would be the same for a project in Boston governed by § 14 and § 15 of the bill. The answer to question 3 is comprised in our answer to question 1. To question 3, qualified by the same proviso as we suggested to question 1, the answer is "Yes."

The answer to question 4, which is also comprised in our answer to question 1, is "Yes."

Question 5 asks whether the special provisions of §§ 14 and 15 of the bill, transferring to the Authority important duties and powers with respect to Boston projects, "constitute an unconstitutional discrimination in favor of" Boston projects as against projects elsewhere, or deny equal protection of the laws to persons in other cities and towns, in contravention of the Fourteenth Amendment to the Constitution of the United States. Question 6 we interpret as presenting essentially the same question, confined to corporations other than insurance companies and savings banks. If question 6 is intended to present any other issue, it is not apparent to us what that issue is.

The equal protection clause of the Fourteenth Amendment does not prevent reasonable classification of subjects of legislation. It also does not preclude legislative action providing treatment of problems in one community, different from the treatment of those problems in another community, in a manner having a reasonable relationship to the objects of the legislation. Different treatment is justified if the conditions in these communities differ sufficiently so as fairly to give rise to the legislative belief that such different treatment is desirable in the public interest, and if the legislation operates equally within each geographical area with respect to persons similarly situated. See *Brest* v. *Commissioner of Ins.* 270 Mass. 7, 14–19; *Goodale* v. *County Commrs. of Worcester,* 277 Mass. 114, 149–150; *Connor* v. *Metropolitan Dist. Water Supply Commn.* 314 Mass. 33, 37–38; *Century Cab Inc.* v. *Commissioner of Ins.* 327 Mass. 652, 660–665; *Doherty* v. *Commissioner of Ins.* 328 Mass. 161, 164; *Williams* v. *Eggleston,* 170 U. S. 304,

310; *Mason* v. *Missouri*, 179 U. S. 328, 334–335; *Hadacheck* v. *Chief of Police of Los Angeles*, 239 U. S. 394, 409, et seq. In arranging and rearranging governmental subdivisions and the powers and duties of their officers and boards, the Legislature has comprehensive powers. See *Commonwealth* v. *Plaisted*, 148 Mass. 375, 383–387; *Broadhurst* v. *Fall River*, 278 Mass. 167, 171; *Moore* v. *Election Commrs. of Cambridge*, 309 Mass. 303, 314–322; *Mayor of Gloucester* v. *City Clerk of Gloucester*, 327 Mass. 460, 464. See also cases referred to below in our answer to question 10.

The treatment proposed for projects in Boston differs from that for the rest of the Commonwealth in the following principal respects: (1) The Authority, subject only to the approval of the mayor, is itself to operate as a planning board for Boston and is to exercise the powers which the local planning board and the State Housing Board now do and still would exercise in the case of a project outside of Boston. (2) The Authority (see the bill, §§ 14, 15) may prescribe regulations applicable to Boston projects different from those prescribed by the State Housing Board under c. 121A, § 4. Certain of the Authority's regulations may be embodied in the approval of the project rather than being of general application, as are regulations under c. 121A, § 4. (3) Deviations from zoning, building, health, and fire laws may be authorized by the Authority with the approval of the mayor (see bill, § 15) rather than by proceedings as contemplated in c. 121A, § 6, subject to and in accordance with generally applicable statutory provisions for obtaining such deviations (see G. L. c. 40A) which contain important safeguards for affected public and private interests. (4) The requirements for applications under c. 121A, § 5, for projects outside Boston, are somewhat more comprehensive than for applications relating to Boston projects under § 15 of the bill.

Boston has frequently been the object of special legislative attention. It has been excluded from the operation of various general laws, and the same subject matter has been covered by special legislative provisions applicable only in

Boston, enacted presumably with a view to meeting special conditions there and dealing more appropriately with its special requirements. See, for example, various provisions of the municipal finance act, from the operation of which Boston is excluded, or by which a special provision is made for Boston. G. L. c. 44, §§ 2, 7, 31, 31A, 32. The Legislature may reasonably conclude that the largest city in the Commonwealth, in the heart of a great metropolitan area, may be subject to problems and conditions not found in comparable degree in other communities. It may reasonably determine also that a separate Boston board, familiar with Boston conditions, to deal with redevelopment there, will be more suitable than one also charged with similar problems elsewhere, and that different procedures for approval and administration of projects in Boston, and to facilitate their execution, will better serve the public interest. In the absence of some specific showing that there is no reasonable basis for the proposed separate classification and different treatment of Boston projects, or that in some manner it operates unequally in respect of those to whom it is applicable, we perceive nothing in the proposed procedural provisions governing Boston projects as compared to those governing projects elsewhere which denies to any person the equal protection of the laws.

Subject to the foregoing discussion, and in the light of our interpretation of question 6, we answer question 5 in the negative and question 6 in the affirmative.

Question 7 asks whether the Legislature, by the proposed new § 6A of c. 121A, may authorize cities and towns to provide by contract that a project is not to be affected by any subsequent amendment either of c. 121A or of any rule, regulation, or standard regulating such project. Question 9 presents the closely related issue whether such a contract, if made, will so bind the Commonwealth that subsequent amendments of c. 121A, especially of § 10 which provides tax exemption, will not apply to the project. These two questions are considered together.

Cities and towns, as agencies of the State, may be given, subject to constitutional limitations, such functions and

powers, including power to make contracts, as the Legislature may determine. See *Commonwealth* v. *Plaisted,* 148 Mass. 375, 386; *Opinion of the Justices,* 293 Mass. 589, 599, 603. See also *Commonwealth* v. *Hudson,* 315 Mass. 335, 345; *Berube* v. *Selectmen of Edgartown,* 331 Mass. 72, 74; *Atherton* v. *Selectmen of Bourne,* 337 Mass. 250, 255–256. The Legislature, however, has no power to make, or to delegate the power to make, a contract "which in effect is a surrender . . . of the sovereign powers of the Commonwealth. The right to exercise the police power cannot be relinquished even by explicit stipulation." See *Opinion of the Justices,* 293 Mass. 589, 599–601, in which the Justices advised (pp. 602–606) that it was beyond the power of the Legislature by statute to limit for an indefinite period its own future authority to change the statutory powers of management, the method of appointment, and the tenure of public officers of the Boston Metropolitan District as then proposed to be established, and in other important respects to impose "stringent, if not permanent, restrictions on the competency of the General Court to legislate for the public welfare concerning" the Boston Elevated Railway system.

On the other hand, in *Opinion of the Justices,* 261 Mass. 523, 553, it was said that "the sovereign power itself may in certain conditions for the public welfare make a binding contract as to exemptions from taxation." In that opinion a proposed contractual tax exemption affecting the Boston Elevated Railway, to be embodied in a statute, was stated not to "be subject to revocation and amendment without the consent of the railway company." Cf. *Massachusetts Gen. Hosp.* v. *Belmont,* 233 Mass. 190, 200. In *Boston Elev. Ry.* v. *Commonwealth,* 310 Mass. 528, it was held (p. 549) that "the Legislature had the power . . . to bind the Commonwealth by a contract . . . embodied in St. 1897, c. 500, that the [railway's] Atlantic Avenue location should not be revoked without payment of compensation therefor," and that revocation of the location by St. 1939, c. 482, if "considered . . . as a revocation at the pleasure of the

Legislature," would impair the obligation of the earlier statutory contract (p. 554). This court pointed out (p. 553) that the term "police power" has two meanings. In a broad sense, it is used as "embracing in substance the whole field of State authority." It also "has a narrower signification" (see pp. 552–553) encompassing only the fundamental power to establish regulations necessary to secure the health, safety, good order, comfort, or general welfare of the community, defined "with some strictness, so as not to include everything that might be enacted on grounds of mere expediency." The principle (see p. 553) "that the police power cannot be bargained away does not wholly preclude the Legislature from dealing with public rights by contract so as to prevent subsequent legislative action in violation of such contract" in matters not within the "narrower signification" of the police power.

It is hard to draw precisely the line of demarcation between (a) those contracts binding upon the Commonwealth which preclude future legislative change impairing their obligation without the payment of compensation, and (b) contracts which invalidly purport to bind the Commonwealth not to exercise its police power. The opinions already cited give general indication of where the dividing line lies.

In the light of all these principles, to avoid serious constitutional doubts (see *Ferguson* v. *Commissioner of Corps. & Taxn.* 316 Mass. 318, 323–324; *New England Tel. & Tel. Co.* v. *National Merchandising Corp.* 335 Mass. 658, 664; *Worcester County Natl. Bank* v. *Commissioner of Banks,* 340 Mass. 695, 701), we are constrained to interpret the second sentence of the proposed § 6A sufficiently narrowly to ensure its constitutional validity. We think that this sentence, if enacted, would authorize cities and towns to agree that, for a reasonable period, the project will not be affected by amendment of those provisions of c. 121A (and of the rules, regulations, and standards) which, to furnish a sound basis for proceeding with the necessary investment, are proper and natural for inclusion in a contract for

major  construction  affected  with  a  public  interest.  We
would  not  interpret  this  sentence  as  granting  power  to
make  inviolable  by  later  legislation  those  provisions  of  this
chapter,  and  of  applicable  rules,  regulations,  and  stand-
ards,  which  deal  with  matters  of  general  regulation  of  the
community  in  a  manner  closely  related  to  its  health,  morals,
safety,  and  fundamental  welfare.  For  example,  a  city  or
town  could  under  this  provision  agree  (a)  that  for  the  forty
year  period  mentioned  in  c.  121A  (as  amended  by  the  bill)
the  project  would  be  subject  to  State  and  local  taxes  and
excises  only  in  accordance  with  the  contract  and  the  pro-
visions  of  c.  121A  in  force  at  the  time  of  the  contract;  and
(b)  that  for  a  reasonable  period  the  statutory  provisions
for  determining  the  project  owner's  income  return  and
dividends  would  not  be  altered.  We  think  that  the  period
not  exceeding  forty  years  stated  in  the  bill  as  the  period  of
tax  exemption  would  be  a  reasonable  period  to  designate
as  the  period  of  such  a  contract.  A  longer,  precisely  de-
fined  period  might  be  reasonable  in  appropriate  circum-
stances  and  as  to  designated  matters.

On  the  other  hand,  the  Legislature  could  not  authorize  a
city  or  town  to  agree  (1)  that  the  project  would  be  free
from  subsequent  legislative  regulation  within  the  strict  or
"narrower  signification"  of  the  police  power,  already  men-
tioned,  for  example,  legislation  prescribing  precautions
against  new  health  hazards,  generally  applicable  to  all  per-
sons  in  the  community  similarly  situated;  or  (2)  that  no
changes  would  be  made  in  the  governmental  structure  (e.g.
membership,  method  of  selection  of  members,  duties,  etc.)
of  the  various  municipalities  and  public  bodies  or  officers
exercising  regulation  over  such  projects.

Questions  7  and  9  are  each  answered,  "Yes,"  subject  to
our  interpretation  of  § 6A.

Question  8  asks  with  respect  to  the  new  § 6A  of  c.  121A,
as  provided  in  § 5  of  the  bill,  whether  the  Legislature  may
authorize  a  city  or  town  to  obtain,  by  contract  with  a  cor-
poration,  bank,  or  insurance  company  undertaking  a  proj-
ect,  an  agreement  that  it  will  pay  to  the  city  or  town  each

year a specific amount in addition to the excise prescribed
by c. 121A, § 10, in effect as additional taxes. Such a con-
tract would enable a city or town in effect to limit, con-
sistently with the standards set out in c. 121A and in the
bill, the extent of the authorized tax exemption (see
c. 121A, §§ 10, 15) to the minimum amount needed to per-
mit and induce the undertaking of the project. An addi-
tional payment of this type would be a factor, along with
other proper factors, which the housing board or the
Authority should take into account in passing upon appli-
cations for the approval of projects and in applying the
statutory standards. Because the additional payment un-
der § 6A would be obtained by contract, whoever is under-
taking the project would have no ground for complaint.
See *Vance* v. *Burke,* 267 Mass. 394, 397, and cases cited;
see also *Interstate Consol. St. Ry.* v. *Commonwealth,* 207
U. S. 79, 84; *International & Great No. Ry.* v. *Anderson
County,* 246 U. S. 424, 433.

We answer question 8, "Yes."

In question 10, we are asked whether the Legislature, in
view of art. 2 of the Amendments to the Constitution of
the Commonwealth, and of the provisions of G. L. c. 121,
§§ 26KK and 26ZZ, and c. 121A, § 7A, may abolish the
planning board of Boston and transfer its powers and
duties, and those relating to Boston of the State Housing
Board, to the Authority subject to the approval of the
mayor, all as provided in § 14 of the bill.[1]

Article 2 of the Amendments gives to the Legislature
"full power and authority to erect and constitute munici-
pal or city governments, in any corporate town or towns in
this commonwealth, and to grant to the inhabitants . . .
such powers, privileges, and immunities not repugnant to

---

[1] Section 14 of the bill itself contains a provision (and is supplemented in
some respects by a similar provision in § 16) that, as to any Boston project the
Authority shall act in place of the abolished planning board "notwithstanding
that it [the Authority] may have made a contract directly or indirectly affect-
ing the project." No inquiry is made, and we have not considered, whether
this provision would permit the Authority to exercise administrative functions
and apply legislative standards in any matter in which it may be materially
affected by interest or bias by reason of former action or commitment.

the constitution as the general court shall deem necessary or expedient for the regulation and government thereof.'' Chapter 121, §§ 26KK and 26ZZ (as amended, respectively, through St. 1957, c. 613, § 4 and § 5), impose upon the State Housing Board and upon local planning boards certain administrative duties with respect to the consideration and approval of redevelopment and urban renewal projects. G. L. c. 121A, § 7A (as amended through St. 1955, c. 654, § 4A).

Reference already has been made to the Legislature's broad power to revise the structure, powers, and duties of State and municipal administrative departments, agencies, and boards and to redistribute the powers and duties of such bodies. See *Commonwealth* v. *Hudson,* 315 Mass. 335, 344–345, and cases cited. See also *Commonwealth* v. *Plaisted,* 148 Mass. 375, 386–387; *Commonwealth* v. *Theberge,* 231 Mass. 386, 390; *Mayor of Gloucester* v. *City Clerk of Gloucester,* 327 Mass. 460, 464; *Atherton* v. *Selectmen of Bourne,* 337 Mass. 250, 255–256. We perceive nothing in art. 2 of the Amendments, in G. L. c. 121, §§ 26KK and 26ZZ, as amended, or in G. L. c. 121A, § 7A, as amended, which would deprive the Legislature of power to enact § 14 of the bill.

We answer question 10 in the affirmative.

In question 11, inquiry is made whether the Legislature, under art. 60 of the Amendments to the Constitution of the Commonwealth, may authorize the Authority, subject to the approval of the mayor, as § 15 of the bill proposes, to grant permission for deviation from a zoning law.

Article 60 of the Amendments provides that the Legislature ''shall have power to limit buildings according to their use or construction to specified districts of cities and towns.''  ''The power of the General Court over the subject of zoning'' has been said to be ''supreme'' (see *Bennett* v. *Board of Appeal of Cambridge,* 268 Mass. 419, 422; *Attorney Gen.* v. *Dover,* 327 Mass. 601, 604–605). This power, together with the broad legislative power to revise the governmental structures of cities and towns and the

powers and duties of municipal bodies and boards, amply warrants delegating under appropriate standards to the Authority, subject to the approval of the mayor, the power to grant zoning deviations in respect of Boston projects. It is not fatal to validity that different or fewer standards and procedural safeguards are provided in § 15 with respect to deviations affecting Boston projects than are imposed in respect of a variance granted in other communities in the manner contemplated by G. L. c. 40A, § 15 (as amended through St. 1958, c. 381), or in respect of an exception (see c. 40A, § 4, inserted by St. 1954, c. 368, § 2). What has been said in our answer to questions 5 and 6 with reference to the reasonableness of separate legislative classifications applicable to Boston is equally applicable here.

We answer question 11 in the affirmative.

RAYMOND S. WILKINS.
JOHN V. SPALDING.
HAROLD P. WILLIAMS.
EDWARD A. COUNIHAN, JR.
ARTHUR E. WHITTEMORE.
R. AMMI CUTTER.